UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
——

JOHN MICHAEL CADARETTE,

                    Petitioner,                  Case No. 1:11-cv-741

v.                                         Honorable Paul L. Maloney

CINDI CURTIN,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Genesee County Circuit Court, Petitioner was convicted of first-degree home invasion, MICH. COMP. LAWS § 750.110a, two counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b, armed robbery, MICH. COMP. LAWS § 750.529, conspiracy to rob while armed with a weapon, MICH. COMP. LAWS § 750.157a, being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and possession of a firearm during the commission of the felonies of CSC I, armed robbery, home invasion, and/or being a felon in possession, MICH. COMP. LAWS § 750.227b. On October 30, 2008, Petitioner was sentenced as a second felony offender, MICH. COMP. LAWS § 769.10, to concurrent prison terms of 117 to 160 months on the home-invasion conviction, 450 to 800 months on the two CSC-I convictions, 450 to 800 months on the armed-robbery conviction, 450 to 800 months on the conspiracy conviction, 18 to 60 months on the felon-in-possession conviction, and a consecutive 2-year term on the felony-firearm conviction.

In his habeas application, Petitioner raises two grounds, both of which were presented to the Michigan Court of Appeals and the Michigan Supreme Court:

I.      Prosecution failed to present sufficient evidence to satisfy the due process standard of guilt beyond a reasonable doubt as [to] the element of penetration.

II.     Trial judge reversibly erred in denying my motion for judicial disqualification.

(Pet., ECF No. 1, PageID.6-7.)  Respondent has filed an answer to the petition (ECF No. 12) stating that the grounds should be denied because they are either without merit or procedurally defaulted. Upon review and applying the AEDPA standards, I find that Petitioner's grounds for habeas relief are without merit. Accordingly, I recommend that the petition be denied.

## **Procedural History**

### **A.      Trial Court Proceedings**

The state prosecution arose from the home invasion, attempted robbery and multiple rapes of a woman while her young daughter and infant were present.  Petitioner was charged with first-degree home invasion, two counts of CSC I, conspiracy to rob while armed with a weapon, armed robbery, being a felon in possession of a firearm, and possession of a firearm during the commission of the felonies of CSC I, armed robbery, home invasion, and/or being a felon in possession.  Following a preliminary examination held on December 2, 2003, Petitioner was bound over on all of the charged offenses.  Thereafter, on January 26, 2004, Petitioner pleaded guilty to all charges.  The plea-hearing record reflects the court's acknowledgment of an in-chambers agreement to sentence within the guidelines as represented by the parties and to a maximum sentence of 32 years.  (Plea Tr. at 18-19, ECF No. 17; *see also* Sent. Tr. at 3, ECF No.18.) Nevertheless, no formal plea agreement was placed on the record.

- 2 -

On February 19, 2004, the sentencing guidelines were calculated at a dramatically higher level, based on numerous scoring enhancements. Petitioner was sentenced to concurrent prison terms of 160 to 240 months (13 years and 4 months to 20 years) for the home invasion, life imprisonment for both CSC I convictions, 450 months (37 years and 6 months) to life for both the robbery and conspiracy, 18 to 60 months (1 ½ to 5 years) for being a felon in possession, and a consecutive 2-year term for the felony firearm charge. The sentences for the robbery and conspiracy were subsequently amended to 450 to 800 months (37 years and 6 months to 66 years and 8 months).

Petitioner, through appellate counsel, filed a motion to withdraw his plea and/or to recalculate the sentencing guidelines, which was denied on November 8, 2004. Petitioner moved for an evidentiary hearing on the effectiveness of counsel and for an independent psychological examination. That motion was denied on January 10, 2005. Petitioner then sought leave to appeal his convictions, sentences, and the denials of his post-trial motions to the Michigan Court of Appeals and the Michigan Supreme Court. The court of appeals denied leave to appeal on April 15, 2005. (4/15/05 Mich. Ct. App. (MCOA) Ord., ECF No. 34.) However, in an order dated on December 28, 2005, the Michigan Supreme Court reversed and remanded the case to the trial court to allow Petitioner the opportunity to withdraw his plea. (12/28/05 Mich. Ct. Ord., ECF No. 36.)

On March 10, 2008, the plea was set aside. During the hearing on the motion to set aside the plea agreement, the judge expressed significant dissatisfaction with the supreme court's ruling, indicating that, in the judge's opinion, the supreme court had no basis on which to find that the judge had engaged in an in-chambers discussion limiting the sentence. (Mot. to Withdraw Plea Hr'g Tr. at 4-6, ECF No. 23.) Petitioner filed another motion seeking a forensic psychological evaluation, which was granted on April 28, 2008. (Mot. for Psych. Exam. Hr'g Tr., ECF No. 24.)

Petitioner also filed a motion to disqualify the trial judge for his perceived bias shown at the March 10, 2008, hearing to withdraw the plea agreement.  The motion was heard and denied on July 28, 2008.  (Mot. to Disqualify Hr'g Tr., ECF No. 26.)  Petitioner was tried before a jury beginning on September 23, 2008, and concluding on September 26, 2008.[1]

The victim, FC, testified that, on October 28, 2003, at about 9:30 p.m., while rocking her infant daughter to sleep, she heard a knock at her front door.  (Tr. II at 34.)  She laid her daughter on the bed and went to the door.  (*Id.*)  Because her porch light was out, FC opened the door without knowing who was there.  FC did not recognize the man when she opened the door, but she later learned that he was Jeff Cadarette, the brother of Petitioner John Cadarette.  FC had been acquainted with Petitioner for some time, as she previously had lived in the same mobile home park and her middle daughter's father was a friend of Petitioner's.  (*Id.* at 35, 40.)  She had seen Petitioner on a daily basis for four years, and he had been to her current address three times.  (*Id.* at 41, 39.)

On the night in question, Jeff addressed FC by name and asked if FC's landlord, BT, was there.  FC told Jeff that the landlord did not live there.  Jeff told FC that he was supposed to meet BT there and asked if she had the landlord's phone number.  (Tr. II at 35.)  FC realized the situation was strange, and she began to shut the door.  Jeff then sprayed mace through the screen door, hitting FC in the face, causing such bad burning that she had difficulty seeing.  (*Id.* at 36.)  She began to struggle with Jeff, because she was concerned about her children being home.  Jeff hit her in the head and they ended up on the ground.  Jeff pulled a handgun, told her to stop struggling, and

---

[1]The Court hereafter will refer to the record transcripts as follows:
Tuesday, September 23, 2008 (ECF No. 29):  "Tr. I at ___";
Wednesday, September 24, 2008 (ECF No. 30):  "Tr. II at ___";
Thursday, September 25, 2008 (ECF No. 31):  "Tr. III at ___";
Friday, September 26, 2008 (ECF No. 32):  "Tr. IV at ___."

then hit her in the head with the gun.  She stopped struggling, and he ushered her into the house, closing both doors.  He had her sit on the couch while he searched for a few minutes.  Jeff told her not to let the man outside, whom he called "Brian," know that she had seen Jeff's face, or Brian would kill her.  Jeff looked around for something to put over FC's face, eventually taking a pillowcase from her bedroom pillow, placing it over her head, and tying it.  FC asked Jeff to let her take the baby off the bed and put her into the crib so that she would not fall, and he allowed her to do so.  (*Id.* at 37-38.)  Jeff then saw the cell phone on the bed, and he took it.  Jeff talked to her, wondering where "Brian" was.  She asked, "Who is Brian, John Cadarette?"  (*Id.* at 38.)  Jeff became flustered, asking why she thought that.  FC explained that Petitioner had been being dropped at her house regularly, and, on one night when he had called that he would come over, her car was broken into.  Jeff kept asking her questions about how she knew John and telling her not to let "Brian" know that she saw Jeff's face, because Brian would kill her.  (*Id.*)

FC explained that she lived well away from other people and that few people knew she lived there.  Petitioner, however, had been to her house three times, representing once that he had had a fight with his wife, another time that he and a friend had been drinking and could not drive home.  The first time he came, FC was leaving the house.  (*Id.* at 39.)  The second time, she realized that there was no bar in the area.  Because it was odd, she told them that her mother was coming early in the morning, so they could not stay.  The next day, she realized that her car had been broken into.  She called the person who had been with John, who told her that he had seen John walk to the back of her house and that John probably broke into her car.  (*Id.* at 40.)

After some time, Jeff began calling for "Brian" out the doors, complaining that it was taking too long.  Jeff also asked her repeatedly where the safe and the money were.  FC did not have

- 5 -

a safe, and all of her belongings were packed, in preparation for a move.  Eventually, FC heard

another person come in the back door and into the kitchen.  The two men whispered for awhile, and

they attempted to find the money.  (*Id.* at 42.)  They repeatedly asked her if her boyfriend, or BT,

was going to come.  Only Jeff, the first man, talked out loud.  She told them that she had three

dollars in her purse.  They searched her refrigerator and freezer.  They wanted to go into the

basement, but she did not have access.  FC also told the men that her older daughter was upstairs,

because she did not want them to go upstairs, where she believed her daughter would recognize

Petitioner.  (*Id.* at 43.)  The men asked her to let them in the back door of the garage, but she did not

even know that it had a back door, as the garage was for the owner's use.  Petitioner went out the

back door and Jeff led FC, still wearing the pillowcase, out the back door after Petitioner.  Jeff kept

telling her how the other man had forced him to be there; he did not want to be there.  (*Id.* at 44.)

When they got to the back of the garage, Jeff asked her how to get in the back door.  She responded

that she did not have a key and had never been in the garage.  The men then took her farther out in

the grass by the apple trees.  Jeff told her not to worry; if she cooperated, she would not be hurt.  (*Id.*

at 46.)

Jeff took the pillowcase off of her head and put it around her eyes, so that she could perform

oral sex on him.  (*Id.* at 49.)  Jeff then handed the gun to Petitioner and told him that, if FC acted

funny, Petitioner was to kill her.  Jeff made FC reach up and feel the gun, which he cocked, so that

she would know that it was there.  He then continued to rape her from the rear, while Petitioner held

the gun.  (*Id.* at 46.)  After several attempts, he succeeded in penetrating her from behind.  (*Id.* at 46,

49.)  At one point during the rape, FC tried to sit up and adjust herself, because he had her down on

her hands and knees on the debris-covered ground.  Jeff hit her in the head with the gun and told her

to stop moving or he would kill her.  After raping her, Jeff told her to get up and go back in the house, so she stood and pulled her pants back up.  (*Id.* at 47.)

They went back inside the house, and the men made FC sit on the couch.  They turned out the lights, and the men paced around for about ten minutes, smoking cigarettes.  (*Id.* at 46, 51.)  At one point, the men turned the lights back on, and, as they walked through the kitchen, she could see through the pillowcase.  (*Id.* at 51-52.)  Petitioner was standing directly underneath the bright kitchen light, and she could see the outline of his body, the shape of his face, that he was white, and that he had dark hair and facial hair.  (*Id.* at 52, 93-95.)  When she got close to Petitioner, she recognized him by his personal smell.  (*Id.* at 53, 99, 104.)  She also recognized the jacket he was wearing, because she had bought it for her ex-boyfriend.  (*Id.* at 50.)  She also recognized Petitioner by his deep, harsh cough, in conjunction with the sound of his whispers.  (*Id.* at 55, 88, 100, 104.)  The men put her on the floor and turned the lights out.  They then walked her outside again.  (*Id.* at 50.)  FC testified that she could see, looking down, despite the pillowcase over her head.  (*Id.* at 53.)  Once outside, she was forced to perform oral sex on Petitioner while Jeff held the gun.  (*Id.* at 53.)  Jeff then told her to get on her hands and knees again, and Petitioner attempted to penetrate her from behind, which he accomplished only slightly.  (*Id.* at 53-54.)  Jeff became impatient and told them to go back in the house.  (*Id.* at 54.)  Back in the house, they made her lie down on the floor.  Jeff told her to take off her pants and give her panties to him.  (*Id.* at 56.)  He tied her with her cellphone charger cord and a belt.  (*Id.* at 56-57.)  Jeff told her to wait a few minutes before calling the police, and then they left the room and the house, and she heard a loud car start and drive away.  (*Id.* at 57.)

FC chewed her way through the phone cord and went upstairs to wake her seven-year-old.  Her daughter began screaming and crying when she saw her mother's condition.  FC explained that they needed to leave the house because someone had broken in and it was not safe. She took her daughter and baby and went to the gas station at Pierson and Linden streets.  (*Id.* at 58.) Two police officers, Officers Tyson and Phillips, were in the station, and her injuries were apparent. She explained that someone had broken into her house, that her children were in the car, and that she did not have any bottles or diapers for her baby.  The officers called an ambulance, and FC called her mother.  At the hospital, she had to wait for four hours before being seen and having a rape kit completed.  The police kept her clothes.  She was taken to the Mount Morris Township Police Department, where she gave a statement and was photographed.  (*Id.* at 59.)

By the time she finished making her statement to Sergeant Morris, it was the next morning. She went back to the house with the police, and the police did a walk-through.  She did not actually go into the house at that time, because it was taped off.  (*Id.* at 60-61.)  They went outside to look where she had been assaulted.  (*Id.* at 61.)  The house remained taped off through October 29, 2003. When she returned home on October 30, she noticed a cigarette butt on a piece of trim in the kitchen. FC did not smoke in the house, and she knew the men had been smoking.  (*Id.* at 60-61.)  She called Sergeant McKenna and told him that the cigarette butt was not hers, so they needed to come over and pick it up, which they did.  (*Id.* at 61.)

FC identified a series of photographs of her home, from the outside and inside, as well as the pillowcase, phone cord and belt with which she was confined.  (*Id.* at 61-69, 74-76.)  She also identified the photographs showing the bruising on the left side of her face and eye, the scratch on her nose, and the injuries to her wrists from being bound.  (*Id.* at 70-71.)  FC testified that the bruises

all got significantly worse in the days after being photographed.  (*Id.* at 71.)  She again stated that

the men took her underwear on the night of the assault.  (*Id.* at 72.)  She identified the pair of

underwear taken as People's Exhibit 14, which she had not seen since that night.  (*Id.* at 72.)  She

also identified the clothing that she had been wearing.  (*Id.* at 77.)  The sweat pants she was wearing

had brown stains on the knees, where she had been kneeling in the mud, sticks and apples.  (*Id.* at

78.)

   FC did not know Jeff Cadarette on the night of the assault, but she was shown a

photographic lineup when she was at the police station, and she identified Jeff Cadarette, noting on

the back of the photograph (Exhibit 21) that the "photo is the closest to the suspect who assaulted

me on October 29, 2003." (*Id.* at 78-79.)

   Detective Clay Hite of the Mount Morris Township Police Department testified that

he assisted in the investigation of the incident and in locating Petitioner and Jeff Cadarette.  He

transported John Cadarette to Hurley Hospital to complete a DNA kit.  (*Id.* at 115.)  Petitioner made

a statement to Hite, asking if they had spoken to his brother and his sister.  Petitioner also asked if

they had spoken to the media in Bowling Green, Kentucky.  Petitioner stated that the paper had

reported that he had beaten a victim and left her for dead.  Petitioner also stated that he had gone to

the house to rob a drug dealer, BT, and they thought they would get between $3,000.00 and

$6,000.00  (*Id.* at 116, 121-22.)  However, the incident did not happen the way Petitioner had

planned.  (*Id.* at 116, 121.)  Petitioner told Hite that FC was a friend of his, and that his brother Jeff

was the one who had not followed the plan and had carried out the assault.  (*Id.* at 117.)  Petitioner

told Hite that his brother had possession of the handgun for the entire night; Petitioner had not

handled the weapon.  (*Id.* at 118, 122.)  He also stated that he believed that he was guilty of some

of the acts that had occurred that night.  (*Id.* at 118.)  Detective Hite denied questioning Petitioner, indicating that Petitioner had volunteered the information.  After the DNA kit for Petitioner was completed, Hite took it back to the Mount Morris Police Department.  (*Id.*)  Hite also went to the victim's address to pick up the cigarette butt she reported finding.  (*Id.* at 119.)

Officer Louis Tyson testified that he and his partner, Joseph Phillips, were at the Shell gas station at 5050 West Pierson at 11:27 p.m. on October 28, 2003, when they were approached by FC, who was accompanied by her daughter.  (*Id.* at 124-25.)  She was muddy and crying, and her face was bright red.  FC told the officers that she had been tied up and raped at her home.  (*Id.* at 125.)  FC indicated that the men were looking for BT and a safe.  (*Id.* at 129.)  She told them that she believed that one of the men was Petitioner, whom she recognized by his voice and the way he smelled.  (*Id.* at 125.)  The officers called the ambulance, and FC's mother came to the gas station to pick up the two children.  (*Id.* at 126.)  Based on FC's information, the officers began a search for Petitioner, checking two or three houses in Flint.  They found Petitioner's brother's wife Tricia, and they talked about a vehicle.  Based on that information, they looked for her grayish 1991 Corsica, which had a loud muffler.

Officer Phillips testified similarly.  He stated that, while Officer Tyson spoke to FC outside, Officer Phillips remained inside the store with the two children.  He spoke with FC's daughter Haley, who told him that she did not know what had happened, but her mother was crying when she woke Haley and told her to dress, and, when Haley came downstairs, her mother's face was beaten up.  (*Id.* at 132.)  Phillips rode in the ambulance with FC and waited outside while the hospital performed a rape kit.  He then picked up the clothing and the rape kit and took them back to the department.  (*Id.* at 133.)

Tricia Cadarette testified that she had been married to Jeff Cadarette for eleven years and that Petitioner was her brother-in-law. (*Id.* at 134.) In October 2003, Tricia was living with her mother and her brother, but Jeff was not living there. In the early morning of October 28, 2003, she was visited at her home by the police, who were looking for Petitioner and his car, telling her that the car had been used in a crime. Petitioner had Tricia's car. (*Id.* at 135.) Tricia described her vehicle as a medium to dark gray Chevy Corsica, late-1980s or early-1990s model. She told the police that the car had a number of problems, including a tendency to be loud. She last saw the car on Sunday morning, when Petitioner had dropped her at work. Petitioner was driving, and his wife and son were all in the car. (*Id.* at 136.) Tricia had last seen her husband Jeff the prior afternoon, when he was with Petitioner and his wife and son, Petitioner's brother Alan, and Tricia. The men dropped the two women at a hotel before heading back to Detroit. Jeff had jumped parole and he knew that the Royal Canadian Mounted Police might be looking for him at her house. (*Id.* at 137.) When Tricia talked with Sergeant McKenna, she told him that Petitioner mentioned picking up a pistol while he was driving her to work. (*Id.* at 138.) She stated that Petitioner was supposed to return her car Sunday night, but he did not. (*Id.* at 138.) Tricia had tried to call Petitioner and Jeff multiple times to find out what was going on. At one point, she talked to Petitioner and threatened to call the police to report her car stolen, unless Jeff called her soon. Jeff called five minutes later and told her to "suck it up." (*Id.* at 139.) She had not seen her car since, but she did not report it stolen. (*Id.*)

Detective Sergeant Scott McKenna testified that he was the officer in charge of the case. (*Id.* at 144.) After the crime was reported on October 28, 2003, McKenna went to the scene of the crime, while FC was still at the hospital. (*Id.* at 145, 149.) The weather was 45 degrees and

very rainy, as it had been all night. (*Id.* at 145.) McKenna described the somewhat secluded location of the house and its layout. (*Id.* at 147-50.) He went in the open back door from the deck, down a short hallway, through the kitchen and into the living room. One bedroom was located off the living room, and a stairway led upstairs, to the daughter's bedroom. (*Id.* at 150.) McKenna had photos taken of all areas, and those photos were admitted and described for the jury. (*Id.* at 154-59.) Based on the information he had, McKenna knew that FC had been raped multiple times, but he knew no details. He checked the rumpled bed, removed grass and mud from the sheets, and found some hairs. (*Id.* at 151.) He also found a phone cord at the head of the bed that had been cut or chewed. He also found a brown belt and a white pillowcase that was off the pillow. (*Id.* at 152.) He and the other officers took fingerprints two different times, after communicating with the officer who was with FC. Knowing that there was a struggle at the porch door, he printed the door handle inside and out, but he could not obtain identifiable prints. (*Id.* at 153-54.)

McKenna testified that there were a large number of cigarette butts outside in the rain. He collected some that looked newer, but he did not collect all. (*Id.* at 160.) The back yard of the house was run-down, muddy and deep, and McKenna did not have a clear idea of where things had happened. The following day, the victim came back out to the house and walked them around the property. Given the wet and muddy condition of the ground, they could not find much evidence. (*Id.* at 165.) The victim remembered that the perpetrators had opened the refrigerator to look for money, and she suggested they fingerprint it. No identifiable prints were discovered. (*Id.* at 166-67.) Because the men had taken FC's telephone, McKenna obtained a warrant for a GPS search, which led them to a wide area near the Cracker Barrel and an old Frank's nursery. The uniform

officers looked in the woods to see if they could locate the phone. They also looked in the area streets. But they never found the phone. (*Id.* at 168-70.)

Based on information from the victim that John Cadarette was one of the assailants, information from Tricia Cadarette about Jeff Cadarette's recent presence, and Jeff Cadarette's description, they put together a photographic lineup that included Jeff Cadarette and five individuals resembling him. The victim identified Jeff Cadarette. (*Id.* at 170-72.) The police eventually arrested Jeff Cadarette at the home of one of his sisters in Rochester, Michigan. Jeff Cadarette gave the police a statement, after which they found the vehicle and Petitioner in Bowling Green, Kentucky. (*Id.* at 174-75.) Based on Jeff Cadarette's statement, McKenna drove to Bowling Green and searched the car for evidence. (*Id.* at 176.) They found a black can of mace, which corresponded with the victim's description. (*Id.* at 177-78.) Among other things, they also found Petitioner's wallet in the vehicle. (*Id.* at 179.) The car had been damaged on the driver's side, in the rear of the vehicle. Tricia Cadaratte indicated that, given the car's damage and its prior problems, she did not want it back. (*Id.* at 183-84.) McKenna videotaped the vehicle because he was unable to bring it back. (*Id.* at 184.) Based on Jeff Cadarette's statement, the police also found FC's panties in an eaves trough. (*Id.* at 189, 198.)

McKenna testified that he received a letter from Hurley Hospital about the rape examination conducted on FC. (*Id.* at 186-87.) The report indicated that FC had bruises on her left eye, left elbow, and both knees. (*Id.* at 188.) McKenna also sent to the laboratory FC's clothing, her underwear, certain items collected at the site, and the DNA samples for Jeff Cadarette and Petitioner. (*Id.* at 189-90.) He received back a DNA match for Petitioner on the cigarette butt found

in FC's kitchen.  (*Id.* at 190-91.)  The crotch of FC's sweat pants contained DNA matching Jeff

Cadarette's DNA.  (*Id.* at 191.)

Michigan State Police Forensic Scientist Amelia Proctor testified as an expert in

DNA testing and typing.  (Tr. III at 19.)  Proctor testified that exposure to moisture, heat and

sunlight would not change the DNA type, but it might degrade the sample to prevent identification.

(*Id.* at 20.)  Proctor testified that she tested DNA samples from FC, Petitioner and Jeff Cadarette.

She also tested a swatch of fabric taken from the crotch of FC's sweat pants, a cigarette butt found

in FC's kitchen, and the rectal and vaginal swabs taken from FC as part of the rape kit.  (*Id.* at 21-

22.) The DNA profile from the cigarette butt matched Petitioner's DNA profile.  (*Id.* at 22-23.) The

DNA profile from the sweat pants matched Jeff Cadarette's profile.  In addition, the sperm fraction

and DNA profile from the rectal swabs matched Jeff Cadarette.  The DNA profile from the vaginal

swabs was a mixture of the DNA profile of FC and a donor profile from which Jeff Cadarette could

not be excluded.  (*Id.* at 23.)  The probability of the relevant samples not being from Jeff Cadaretee

exceeded 202.9 quadrillion to one Caucasian individuals.  The probability of the DNA samples from

the cigarette butt not being from Petitioner was one in 383.1 quadrillion individuals.  (*Id.* at 25.)

Phillip Thick testified as an expert in fingerprint identification. (*Id.* at 37.)  He first

testified about why prints might not be left when people touch things.  (*Id.* at 38-41.)  Thick testified

that he received three fingerprints for analysis, none of which he could identify with a known source.

(*Id.* at 41.)  The people then rested.  (*Id.* at 47.)

Petitioner recalled the victim to the stand for cross-examination.  She stated that,

while Petitioner orally penetrated her, he did not penetrate her vagina, but only touched her vagina

with his penis a couple of times.  (*Id.* at 49.)  Petitioner, however, held the gun while Jeff Cadarette

vaginally penetrated her.  (*Id.* at 50.)  No further defense testimony was introduced.

At the conclusion of trial, on September 26, 2008, the jury found Petitioner guilty of

all charges:  first-degree home invasion; two counts of CSC I; armed robbery; conspiracy to commit

armed robbery; being a felon in possession; and felony firearm.  (*Id.* at 90-91.)  On October 30,

2008, Petitioner was sentenced as a second habitual offender to prison terms of 160 to 300 months

for the home invasion; 450 to 800 months on each of the CSC-I convictions; 450 to 800 months on

both the armed robbery and conspiracy to commit armed robery; 18 to 60 months on the felon-in-

possession offense; and two years on the felony-firearm offense.  (Sentencing Transcript, (S. Tr.),

14-16, ECF No. 33.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on February 23, 2009, raised the two issues presented in this application for

habeas corpus relief, together with a third claim concerning the appropriateness of making the

sentence for felony firearm run consecutively to the armed robbery.  (*See* Def.-Appellant's Br. on

Appeal, ECF No. 37.)   By unpublished opinion issued on April 20, 2010, the Michigan Court of

Appeals rejected the first two appellate arguments but agreed with the third appellate issue and

remanded the case for correction of the sentence.  (*See* 4/20/2010 Mich. Ct. App. Opinion (MCOA

Op.), ECF No. 37.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the two claims rejected by the court of appeals and presently before this

Court on habeas review.  By order entered September 27, 2010, the Michigan Supreme Court denied

his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 38.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court

announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

### I.     Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner contends that the prosecution presented insufficient evidence to support his conviction for two counts of CSC I. Specifically, Petitioner argues, as he did at trial, that the prosecutor presented no evidence to support the element of penetration.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Although it cited only state-court decisions, the Michigan Court of Appeals applied

the *Jackson* standard, analyzing the issue as follows:

Defendant first argues that there was insufficient evidence to support his convictions of two counts of CSC I. We disagree.

There are several different forms of CSC I defined in MCL 750.520b(1). Defendant was charged with CSC I under MCL 750.520b(1)(e), which has the following elements: (1) sexual penetration of the victim by the defendant, (2) while the defendant is armed with a weapon. See *People v Smith*, 128 Mich App 361, 365-366; 340 NW2d 855 (1983). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r); *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

MCL 767.39 states:

Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

The elements of aiding and abetting are: (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006). An aiding and abetting instruction is proper where there is evidence that "(1) more than one person was involved in the commission of the crime, and (2) the defendant's role in the crime may have been less than direct participation in the wrongdoing." *People v Head*, 211 Mich App 205, 211; 535 NW2d 563 (1995). However, a person's mere presence, even with knowledge that an offense is about to be committed or is being committed, is not enough to make a person an aider and abettor. *People v Turner*, 125 Mich App 8, 11; 336 NW2d 217 (1983).

Viewing the evidence of this case in a light most favorable to the prosecution, we find that there was sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty—albeit partially as an aider and abettor, MCL 767.39—of both orally and vaginally penetrating the victim. The first time the victim was taken to the back of the

property, defendant held a loaded gun while his brother, Jeffrey Cadarette, placed his penis into the victim's mouth and vagina. The victim's hand was placed over the gun so she knew that defendant would kill her if Jeffrey told him to do so. The victim was then taken back into the house. Within the hour, both men again led the victim to the back of the property. This time, defendant placed his penis into the victim's mouth. Defendant also attempted to place his penis into the victim's vagina; however, he was only able to touch the victim's vagina with his penis because Jeffrey told defendant it was time to go. Based on the evidence, a reasonable jury could have concluded that defendant aided and abetted Jeffrey in the oral and vaginal penetration of the victim. Moreover, a reasonable jury could also have concluded that defendant, himself, orally penetrated the victim. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). The prosecution offered sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty of two counts of CSC I under MCL 750.520b(1)(e).

(MCOA Op. at 1-2.)

As outlined in the facts, and as the Michigan Court of Appeals recognized, the victim squarely testified that Petitioner orally penetrated her and made some attempt to vaginally penetrate her, though he was not successful. In addition, the victim testified that Petitioner held a gun on her while his brother orally and vaginally or anally penetrated her. The victim's testimony provided ample evidence that Petitioner personally penetrated the victim orally. That same testimony thoroughly supported the state court's conclusion that he aided and abetted his brother in multiple penetrations of the victim. The evidence that Petitioner held a gun on the victim while his brother raped her fully supports the jury's conclusion that Petitioner aided and abetted Jeffrey Cadarette in orally and vaginally or anally penetrating the victim. Under these circumstances, the state court reasonably applied established Supreme Court precedent in rejecting Petitioner's first ground for habeas relief.

II.   Judicial bias

- 21 -

Petitioner contends that the trial court erred and denied him due process when the judge denied his motion to disqualify.  In his motion, Petitioner contended that the trial judge was biased against him because the court denied Petitioner's motion to withdraw his plea, which was ultimately overturned on appeal.  After remand, the judge expressed his disagreement with the Michigan Supreme Court's characterization of the original plea proceedings.  Petitioner suggests that the trial judge's comments about the supreme court's analysis demonstrate actual bias against Petitioner.

The Michigan Court of Appeals held that Petitioner's claim was not properly before the court because Petitioner had failed to appeal to the chief judge the trial judge's denial of the motion to disqualify.  *See* MICH. CT. R. 2.003(C)(3).  The court therefore concluded  that Petitioner was entitled to review only for plain error affecting substantial rights.  Applying plain-error review, the court of appeals rejected Petitioner's claim.

"If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally

defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  I therefore will proceed to the merits of the case without addressing the procedural default.

[D]ue process demands that the judge be unbiased.  *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of *actual* bias in the trial of cases.") (emphasis added).  Furthermore, a judge can and should be disqualified for "bias, [ ] a likelihood of bias[,] or [even] an appearance of bias." *See Ungar v. Sarafite*, 376 U.S. 575, 588 (1964); *see also Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *accord Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

Nevertheless, not all appearances of bias are of constitutional significance; indeed, "most matters relating to judicial disqualification d[o] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)) ("All questions of judicial qualification may not involve constitutional validity."); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard.  Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar.").  In only two types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process:  (1) those cases in which the judge "has a direct, personal, substantial

- 23 -

pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. 523 (subsequently

expanded to include even indirect pecuniary interest); and (2) certain contempt cases, such as those

in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141

(subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack

from the contemnor).

      As the court of appeals recognized, Petitioner has wholly failed to demonstrate either

the appearance of bias or actual bias:

> In this case, defendant has not overcome the presumption that the trial court
> judge was impartial.  Defendant argued in his motion to disqualify that Judge
> Hayman manifested a bias against him that would have a negative affect on future
> proceedings.  However, Judge Hayman directly responded to defendant's concerns
> on the record.  Judge Hayman stated that he could impartially hear the case, that he
> was not biased against defendant or his attorney, and that defendant would receive
> a fair trial in his court.  Judge Hayman further clarified that his previous comments
> concerning the Michigan Supreme Court order allowing defendant to withdraw his
> plea[1] "[had] nothing to do with Mr. Cadarette."  Indeed, it appears to us after
> reviewing the record that Judge Hayman's comments in this regard were not directed
> toward defendant, but rather toward the Supreme Court's order.  Although Judge
> Hayman's initial acceptance of defendant's plea was reversed, Judge Hayman
> specifically stated that he held no prejudice or bias toward defendant and that
> defendant would receive a fair and impartial trial.  Defendant simply has not
> demonstrated the existence of prejudice, actual bias, or any other factor that would
> lead us to doubt the veracity of Judge Hayman's statements in this regard.
>
> > [1] On March 10, 2008, during the proceeding to allow defendant to withdraw his plea, Judge
> > Hayman stated, "[a]nd how did [the Michigan Supreme Court] find that there was an in
> > chamber discussion if I disagreed that there ever was . . . [t]hat's what I would like to know.
> > How did they find that? [W]hat did they use as the basis to find that there was an in chambers
> > discussion? It's kinda odd because nobody's asked me."

(MCOA Op. at 3-4.)

      The state court's rejection of Petitioner's claim was patently reasonable.  The court

of appeals held that, as a factual matter, the trial judge's comment did not indicate bias against

Petitioner.  That factual finding is entitled to a presumption of correctness, which the petitioner has

the burden of rebutting by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656; *Sumner*, 449 U.S. at 546 (holding that presumption of correctness under § 2254(e)(1) is also accorded to the factual findings of an appellate court). Petitioner does not and cannot overcome that presumption.  As the court of appeals recognized, nothing about the trial judge's remarks indicated personal bias against Petitioner or creates an appearance of bias.  The judge merely expressed disagreement with the supreme court's characterization of the trial court proceedings.  Moreover, in denying Petitioner's motion, the trial judge fully clarified the reason for his comment, undermining any possible conclusion to the contrary.  Further, the trial as a whole was devoid of any evidence of judicial bias.  Accordingly, Petitioner's second habeas ground is without merit.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: March 14, 2016                    /s/ Phillip J. Green
                                        Phillip J. Green
                                        United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).